Thaddaeus Louis TURNER, Petitioner,

v.

Arthur CALDERON, as Warden of San Quentin State Prison, Respondent.

No. CIV. F–91–153–REC–P.

United States District Court, E.D. California.

June 27, 1997.

Katherine L. Hart, Law Offices of Katherine Hart, Charles T. Taylor, Lang, Richert & Patch, Fresno, CA, for Thaddaeus Turner.

Attorney General Daniel E. Lungren, W. Scott Thorpe, Sacramento, CA, for State.

*DEATH PENALTY CASE*

AMENDED MEMORANDUM AND ORDER RE: CLAIMS 9, 10, 11, 12, 16, 17, 18, 19, 20, 21, 27, 30, 34, AND 36.

COYLE, District Judge.

This amended memorandum and order is filed to clarify the Court's discernment of the law governing death eligibility and sentencing in California. The original memorandum and order was filed on April 29, 1997. This amended document reflects minor grammatical and citation corrections as well as an update of the present procedural status.

## I. Summary of the Relevant Facts

This case involves the stabbing murder of Roy Savage by Petitioner Thaddaeus Louis Turner on April 14, 1984. Mr. Savage was stabbed 44 to 46 times in his Merced home. Several household items and Mr. Savage's late model Cadillac were missing from the house when sheriff's deputies commenced their investigation. Turner admitted the act of stabbing Mr. Savage, taking a television from Mr. Savage's home, and driving away in Mr. Savage's car. He claimed to be a habitual PCP and marijuana user, including on the day of the offense. When Turner was apprehended by a CHP officer in Fresno two days later, he was driving Mr. Savage's car. The missing television set was in the trunk and Mr. Savage's wallet was on the console of the car. None of the other items said to be missing from Mr. Savage's house were recovered.

The evidence adduced at trial discloses that Mr. Savage was a highly respected African–American administrator and instructor

at Merced Community College. In his position as the director of the Educational Opportunity Programs and Services at the college, he helped many young people pursue an education and obtain jobs. Since Mr. Savage owned several rental houses, it was not unusual for him to hire young people to help with landscaping and clean up tasks for these rental houses.

The defense attempted to bring out the fact that Mr. Savage engaged in homosexual activities and cultivated homosexual relations. This inference was alluded to by the testimony of Mr. Savage's second cousin, Gregory Mayo, as well as by his co-worker at the college, Augusti Albritton. Both testified that sometimes Mr. Savage went to San Francisco for week end stays and did not talk about what he did. The defense also called a former bartender, Jay Bradshaw, who worked at a known "gay" bar in Fresno. Mr. Bradshaw had informed police that Mr. Savage was a frequent customer at the bar. Turner testified that he met Mr. Savage at a bus stop just outside this bar in Fresno while Turner was on his way home from work as a construction worker. Mr. Savage offered Turner work performing landscaping tasks on his (Mr. Savage's) house. Turner accepted and Mr. Savage arranged to drive to Fresno to pick Turner up and return to Merced the following week end.

Turner worked for an unspecified time in Mr. Savage's yard, as he was hired to do, and then, with no protest from Mr. Savage, stopped mid-morning. For the remainder of the morning and afternoon, he and Mr. Savage talked and ran errands together. Mr. Savage also invited Turner to listen to his stereo. According to Turner, at the end of the day, while Turner was waiting for Mr. Savage to take him back to Fresno, Mr. Savage first requested, then pleaded for Turner to have sex with him. An argument followed about whether Turner would have sex with Mr. Savage or disclose the fact of Mr. Savage's proposition. Ultimately, Turner testified, the argument became physical and Mr. Savage assaulted him. Turner

claims he drew his buck knife to ward off the unwanted sexual attack. Mr. Savage's perceived persistence was followed by Turner's harried and hysterical response, which resulted in Mr. Savage's death. Mr. Savage's homosexuality and his proposition to Turner were the linchpins for Turner's defense respecting motivation for the killing. During Turner's testimony at trial, he did not controvert that he killed Mr. Savage. Rather, the case focused on Turner's perceived need to defend himself and diminished mental state due to low intelligence and drug/alcohol intoxication.

The prosecutor painted a picture of Turner as an opportunistic, cold-blooded killer motivated by the desire to steal from his victim. The prosecutor argued Turner's story of Mr. Savage's unwanted homosexual overtures was simply unbelievable. To the extent Mr. Savage did express a sexual interest, Turner exploited Mr. Savage's feelings to gain access to Mr. Savage's home and cultivate Mr. Savage's trust. Under the prosecution theory, Turner formulated a premeditated plan to kill Mr. Savage so he could realize his goal to acquire Mr. Savage's property.

Two aspects of the crime were highly contested at trial. The first was whether Turner absconded with all the household items from Mr. Savage's house that were catalogued as missing, or just the items found in his possession at the time of his arrest. The second concerns whether Turner was responsible for cutting two of the three telephone cords in Mr. Savage's house. Since the cords had no blood on them, and the killing of Mr. Savage was a very bloody event,[1] the prosecutor argued Turner cut the cords in advance of the killing as part of his plan to steal. Turner denied cutting the cords or formulating the intent to steal in advance of Mr. Savage's death. He maintains that his decision to take any of Mr. Savage's possessions did not occur until Mr. Savage was dead. He offered an alternative theory that someone entered Mr. Savage's home after the killing, cut the cords and took the rest of the missing items from the house.

1. Blood splatters were observed throughout the family room, including on the floor, the walls, and the ceiling. Bloody footprints also were observed going half way up the stairs to the bedrooms and out to the front door.

## II. Procedural History

Turner's jury returned a verdict of guilty for first degree murder and found true the robbery murder special circumstance on November 21, 1984. On November 27, 1984, the penalty phase commenced and was completed the same day when the jury returned a verdict of the death penalty. Turner's motion for modification of the verdict was heard and denied on December 21, 1984. His direct appeal affirming the conviction and death sentence was filed April 26, 1990. He commenced this federal proceeding on April 1, 1991. On May 25, 1993, the Court ordered Turner to exhaust his state remedies. His state petition for habeas corpus was denied on March 25, 1996. Turner filed his amended Federal Petition on April 29, 1996.

Following the State's Motion to Dismiss the Petition on the grounds of procedural default, the Court issued an Order on October 30, 1996 resolving the State's motion. In the Order, Claims 9, 10, 11, 12, 16, 17, 18, 19, 20, 21, 27, 30, 34, and 36 were determined to be procedurally defaulted based on the *Dixon* rule.[2] Under California law, the *Dixon* rule bars the presentation of claims to the California Supreme Court on state habeas which could have been, but were not, raised on a timely appeal. *In re Dixon*, 41 Cal.2d 756, 759, 264 P.2d 513 (1953). Where the denial of habeas relief by the California Supreme Court rests on independent and adequate state law grounds, federal review of the same claims also is barred. *Coleman v. Thompson*, 501 U.S. 722, 729–31, 111 S.Ct. 2546, 2553–55, 115 L.Ed.2d 640 (1991). For the reasons stated in the October 30, 1996 Order, this Court has determined that the *Dixon* rule is an independent state law ground which precludes federal review.

The issue now before the Court is whether Turner can demonstrate that he should be excused from his procedural default under the cause and prejudice test or the fundamental miscarriage of justice standard. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977); *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649–50, 91 L.Ed.2d 397 (1986). In the October 30, 1996 Order, Turner was instructed to limit his showing to the "prejudice" prong of the cause and prejudice test and actual innocence during the guilt phase of the trial under the miscarriage of justice standard.

In reviewing the record and the parties' briefs, the Court finds that Claims 10, 19, and 30 are not procedurally barred on federal habeas. It is now apparent these claims were not properly categorized by the California Supreme Court as defaulted under the *Dixon* rule in the order denying Turner's state habeas petition.[3] The merits of Claims 10, 19, and 30 were presented to the state court and rejected on direct appeal. *People v. Turner*, 50 Cal.3d 668, 710–14, 268 Cal. Rptr. 706, 789 P.2d 887 (1990). The Court withdraws its earlier determination in the October 30, 1996 Order to the contrary.

In addressing the prejudice prong of the cause and prejudice test, both parties have argued the merits of Claim 10, 19, and 30 complete with record references and citation to legal authority. The arguments on both sides are forceful and logically reasoned. There is no basis to believe the parties failed to advance their best arguments at this stage of the proceedings. Since both parties have thoroughly briefed Claims 10, 19, and 30, no reason appears for the Court not to address and resolve the merits. Claims 10, 19, and 30 are discussed in Part V, below.

The Court finds that all of the claims discussed below lack substantive merit. Accordingly, Turner has not established prejudice or a fundamental miscarriage of justice

---

**2.** The order also concluded that Claims 4, 5, 6, 14, 23, 26, 29, 33, 35, and 37 are not procedurally barred. Claims 13 and 31 were dismissed on the grounds that they fail to raise a colorable federal claim.

**3.** Arguably Claim 10 is procedurally defaulted under the "invited error doctrine," and Claim 19 is procedurally defaulted for Turner's failure to comply with the contemporaneous objection rule. Both of these theories are discussed in Part V, *infra*. Since the State failed to raise these arguments in its earlier motion, they are now foreclosed. *Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir.1982). Claim 30 is not even arguably procedurally defaulted. Its merits are discussed and fully analyzed in the direct appeal opinion without any mention of procedural impediment.

for the procedurally defaulted claims. Claims 9, 11, 12, 16, 17, 18, 20, 21, 27, 34, and 36 are dismissed. Claims 10, 19, and 30 are denied on the merits.

### III. The Standard of Review to Excuse Procedural Default

■ To establish prejudice in the context of overcoming a procedural default, the petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982) (emphasis in original); *Carrier*, 477 U.S. at 494, 106 S.Ct. at 2648–49. The facts must demonstrate that the petitioner "was denied fundamental fairness at trial." *Id.* (internal quotation omitted).

■ A fundamental miscarriage of justice requires a showing that the petitioner either was innocent of the underlying murder or ineligible for the death penalty. In *Carrier*, the Supreme Court refers to the first of these possibilities as an "extraordinary case" where a petitioner establishes "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496, 106 S.Ct. at 2649. This standard of innocence requires "a stronger showing than that needed to establish prejudice." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995). The petitioner must show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Id.*

■ Under the second possibility for establishing a miscarriage of justice, the petitioner may present facts to show ineligibility for the death penalty by clear and convincing evidence. *Sawyer v. Whitley*, 505 U.S. 333, 348, 112 S.Ct. 2514, 2523–24, 120 L.Ed.2d 269 (1992); *see also Schlup*, 513 U.S. at 322–24, 115 S.Ct. at 865. In California, death penal-

ty eligibility is made by the jury's finding of the existence of statutory special circumstances during the guilt phase. *People v. Bacigalupo*, 6 Cal.4th 457, 467, 24 Cal. Rptr.2d 808, 862 P.2d 808 (1993), *cert. denied* 512 U.S. 1253, 114 S.Ct. 2782, 129 L.Ed.2d 894 (1994); *Tuilaepa v. California*, 512 U.S. 967, 975, 114 S.Ct. 2630, 2636–37, 129 L.Ed.2d 750 (1994).[4]

### IV. Analysis of the Defaulted Claims

With the foregoing standards as the foundation, excuse for procedural default is analyzed for the following claims.

**Claim 9:** That the trial court erred in allowing testimony of a psychiatrist who criticized the methodology of Turner's psychologist expert.

■ During the defense case at the guilt phase of the trial, Dr. Phillip Morton Hamm, a psychologist, offered his opinions on Turner's mental state at the time of the crime. In Dr. Hamm's assessment, Turner was mentally dull, had a lower than average ability to solve problems, and had a tendency to lose control under stress. RT: 1481–82. The results of the psychological tests Dr. Hamm administered indicated Turner was both passive and submissive, which is consistent with Turner's version of the facts that the victim, Mr. Savage, was the initiator in all aspects of the acquaintance. RT: 1485–86; 1488–89. Dr. Hamm stated that the effects of PCP, which Turner habitually used and smoked during the day of the crime, including one entire PCP treated marijuana cigarette a short time before the crime, made Turner, who was mentally disorganized in a drug free state, even more disorganized. Turner's cognitive ability was impaired; he was "bombarded with conflicting passionate behavior on the part of Mr. Savage." RT: 1499. On one hand, Mr. Savage was a high powered person being solicitous and kindly, and on the other, he was becoming sexually demanding and physically abusive. Turner was having auditory hallucinations and was in the

---

4. The fundamental miscarriage of justice standard does not apply to the procedural default of a claim challenging sentence selection. *Sawyer v. Whitley*, 505 U.S. at 347, 112 S.Ct. at 2523 ("The actual innocence requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error.").

grips of hysteria. RT: 1500. Eventually, Turner began to disassociate himself from the situation and from his own conduct. RT: 1502. When the crime was committed, Turner was borderline psychotic. RT: 1503.

On cross examination, the prosecutor made a point of establishing that the events Dr. Hamm recounted were not actually what transpired, but what Turner said had happened. RT: 1504. The prosecutor opened the door to his theory that since Turner lied to the police (when asked whether he knew Roy Savage or had ever been to Merced), that he would also lie to the jury. 1509. Dr. Hamm admitted that nobody knows for certain whether Turner was telling the truth when he testified. RT: 1513.

The prosecution rebuttal witness was Dr. Lee Stewart Coleman, a practicing psychiatrist and an avid critic of the role mental health professionals play in legal proceedings determining defendants' mental conditions. RT: 1519–21. Initially, defense counsel objected to Dr. Coleman's recitation of his opinions respecting the value of psychiatry and psychology in the legal system. RT: 1522. Defense counsel argued that the opinion was merely personal opinion, and not the proper subject for expert testimony. RT: 1523. The court overruled the objection, and Dr. Coleman testified: "it's my opinion that the methods of psychiatry and psychology do not allow psychiatrist[s] and psychologist[s] to form opinions that the law, the court think they are getting, that is, *we don't have any scientific methods to in fact make the opinions that we offer as expert.*" RT: 1523–24 (emphasis added). Dr. Coleman further testified that psychological tests are totally unreliable because their results require the subjective opinion of the tester. RT: 1524. Finally, he opined that psychologists have no way of knowing whether facts recounted to them are accurate because their subjects can lie. RT: 1525. Psychologists are very inept at determining whether someone is lying. This is because in a clinical setting, a therapist is supposed to believe what his or her client says. RT: 1526.

Dr. Coleman did not evaluate Turner or offer an opinion on Turner's mental state. He stated health care professionals do not possess the methods to offer such opinions. As to the defense expert, he commented that Dr. Hamm "essentially believed everything he was told [by Turner]." RT: 1527. He stated Dr. Hamm's testimony was

> extremely misleading. The tests are irrelevant ... none of those tests are reliable, even when there isn't any legal issue pending ... [T]he literature is overwhelming that the tests are not reliable. They're too subjective. They depend on the psychologist drawing inferences about these things.... [I]f they're unreliable when there isn't a legal issue going on, they're even less reliable when there is a legal dispute, and the person may have strong reason to want to influence the conclusions of the doctor.

RT: 1528.

On cross examination, Dr. Coleman stated expert mental health testimony in the courtroom is "not only worth nothing, it's worse than nothing." RT: 1542. The best way for jurors to determine the facts, he continued, "is to listen to everything they've heard in the case, and the Defendant's statements, and exclude from any credibility the psychiatric and psychological opinions and decide whether you believe it or not, that's the legitimate way, in my view to do it." RT: 1544. When psychiatrists "try to form opinions that the court is interested in, [they] do not have methods that are beyond what the lay person can do." RT: 1548. In Turner's trial, he concluded the "psychological opinions that have been offered about the Defendant's state of mind do not deserve credibility." RT: 1549.

Turner alleges that Dr. Coleman's testimony did not qualify as admissible expert opinion. The opinion was that "psychiatry and the law do not mix merely because you cannot believe what a client says." Petition, ¶ 144. Turner contends drawing this conclusion is not beyond the ability of any lay witness. Further, the purpose of Dr. Coleman's testimony was to demolish Turner's entire defense. The testimony was prejudicial, he continues, because it attacked the very heart of Turner's mental state defense. Under *Frady,* 456 U.S. at 170, 102 S.Ct. at 1595–96, the admission of Dr. Coleman's tes-

timony worked to his "actual and substantial disadvantage." He also claims the testimony has resulted in a fundamental miscarriage of justice. This conclusion follows from the assertion that Dr. Hamm's testimony "established" that the killing of Roy Savage was not a murder in the course of a robbery but that the robbery was an afterthought.[5] Turner claims Dr. Coleman's testimony actually improperly attacked the admissibility of psychiatric and psychological testimony. Because of Dr. Coleman's testimony, Dr. Hamm's opinion was discounted and Turner was found to have committed Mr. Savage's murder in the course of a robbery. In fact, Turner argues, he is innocent of the robbery special circumstance.

In response, the State focuses on the instructions given to the jury. In particular, the jury was told:

> Every person who testifies under oath or affirmation is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness.

The trial court also instructed:

> In resolving any conflict that may exist in the testimony of expert witnesses, you should weigh the opinion of one expert against that of another. In doing this, you should consider the relative qualifications and credibility of the expert witnesses as well as the reasons for each opinion and the facts and other matters upon which it was based. [¶] You're not bound to accept an expert opinion as conclusive, but should give to it the weight to which you find it to be entitled. You may disregard any such opinion if you find it be unreasonable.

RT: 1635–36; 1639–40.

Under those instructions, the State argues, Turner suffered neither prejudice nor a miscarriage of justice. Dr. Coleman merely

opined that the jury should give no weight to the testimony of Dr. Hamm. He did not attack the admissibility of Dr. Hamm's opinion as Turner claims. The State points out that the California Supreme Court has repeatedly held comments which are directed to the weight and not the admissibility of a witness's testimony are not improper. *People v. Babbitt,* 45 Cal.3d 660, 699, 248 Cal. Rptr. 69, 755 P.2d 253 (1988) (specifically addressing the testimony of *Dr. Coleman*); *People v. Danielson,* 3 Cal.4th 691, 730, 13 Cal.Rptr.2d 1, 838 P.2d 729 (1992) (same); *People v. Clark,* 5 Cal.4th 950, 1019, 22 Cal. Rptr.2d 689, 857 P.2d 1099 (1993) (same).[6]

The Court finds, under the instructions given, the jury was free to reject all or part of Dr. Coleman's testimony, just as it was free to reject all or part of Dr. Hamm's testimony. This is consistent with California law.

> When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows: Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable.

Cal.Penal Code § 1127b.[7] No claim is or could be advanced that California law on this issue violates the Federal Constitution.

The State's argument that the admission of Dr. Coleman's testimony did not prejudice Turner or result in a miscarriage of justice

---

**5.** Turner's confidence in the weight the jury would have given Dr. Hamm's testimony, even in the absence of Dr. Coleman's testimony is overstated. Dr. Hamm's testimony did not "establish" anything. It did present a supported opinion that Turner's mental state was substantially diminished and that Turner did not form the intent to steal until after Mr. Savage died. This opinion, however, is not the equivalent of an established fact.

**6.** Apparently, Dr. Coleman is no stranger to prosecution rebuttal cases to refute the value of defense experts.

**7.** All subsequent statutory references in this Memorandum are to the California Penal Code unless otherwise stated.

has merit. Neither his testimony nor the instructions suggested that Dr. Hamm's opinions were inadmissible. The analysis of Turner's argument in Claim 9, however, need not advance that far. The underpinning of the cause and prejudice and the miscarriage of justice standards is the existence of a *constitutional error.* There was none in this instance. Dr. Coleman's testimony was appropriately admitted, as was Dr. Hamm's. Dr. Coleman did not attempt to persuade the jury that Dr. Hamm's testimony was inadmissible, he merely opined that Dr. Hamm's conclusions were entitled to little weight.

In the absence of a procedural default, Claim 9 would be denied on the merits. Turner has failed to demonstrate either the prejudice prong of the cause and prejudice test or a fundamental miscarriage of justice to excuse his procedural default of Claim 9. The claim is dismissed.

**Claims 11 and 12:** That the trial court erred at the penalty phase for its failure to instruct the jury that mitigating circumstances need not be found unanimously (Claim 12) or beyond a reasonable doubt (Claim 11).

■■■■■■■addresses Claims 11 and 12 as one. He claims the jury's verdict of death resulted from potential confusion that mitigating factors could be considered only if those factors were unanimously agreed upon and determined beyond a reasonable doubt. A sentence resulting from such confusion, he continues is unconstitutional.

The complained of confusion follows from an instruction about aggravating factors. Prior to closing argument the trial court instructed, "Any evidence of an aggravating factor is to be disregarded by you unless you unanimously agree that the factor has been proved beyond a reasonable doubt." RT: 1847. No instruction was read to the jury about how mitigating factors should be considered.

Defense counsel also failed to provide meaningful guidance for the jury's consideration of mitigating factors. In fact, Turner contends, defense counsel's closing statement actually amplified the confusion. During his closing, defense counsel summarized "that various factors have be proved beyond a reasonable doubt." RT: 1858 (emphasis added). He made no effort to distinguish mitigating from aggravating factors. Because of counsel's imprecise and unexplained statement, Turner argues the jury may have erroneously concluded that the standard of unanimity beyond a reasonable doubt which the trial court said applied to aggravating circumstances also applied to mitigating circumstances.

■■ Turner correctly points out that if the instructions led the jury to conclude its determination of mitigating factors had to be unanimous and beyond a reasonable doubt, the sentence would be contrary to the holding in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). In that case the Court held unconstitutional a verdict form which reasonably could be interpreted to require the jury to agree unanimously on the existence of particular mitigating circumstances. *Id.* at 384, 108 S.Ct. at 1870. A sentencing scheme which requires unanimous agreement for mitigating factors would unconstitutionally preclude the sentencer from considering relevant circumstances, including the defendant's character or record and the circumstances of the offense. *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 2965; *see also Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2634–35; *Blystone v. Pennsylvania,* 494 U.S. 299, 307, 110 S.Ct. 1078, 1083–84, 108 L.Ed.2d 255 (1990). The State maintains the jury was not precluded from considering relevant mitigating circumstances and that the instructions given did not lead the jury to conclude mitigating factors had to be unanimous and beyond a reasonable doubt.

■■ The parties' arguments must be evaluated in the context of what is and what is not constitutionally required at the penalty phase of a California capital trial. The standard is summarized in *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983): "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, [by] determining the truth of the alleged special circumstance, the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." *Id.* at 1008, 103 S.Ct. at 3457. It is

during the jury's consideration of these factors at the penalty phase that the defendant's character and record, together with the circumstances of the offense are pondered. *See* *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965. Indeed, these factors are paramount. "What is important at the selection stage is an *individualized* determination on the basis of character of the individual and the circumstances of the crime." *Zant v. Stephens,* 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983) (emphasis in original); *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2634–35.

■■■ Juror discretion during this individualized determination process is quite broad. In *Tuilaepa,* the Court describes the quantum of discretion permitted to be "expansive," "wide," and "unbridled." *Id.* at 973, 974, 979, 114 S.Ct. at 2635, 2636, 2639. *See also Zant,* 462 U.S. at 875, 103 S.Ct. at 2742 ("unbridled discretion"); *Ramos,* 463 U.S. at 1009, n. 22, 103 S.Ct. at 3457, n. 22 (same, *quoting Zant,* 462 U.S. at 875, 103 S.Ct. at 2742). On the strength of United States Supreme Court precedent approving the individualized procedure in California for sentence selection, the California Supreme Court has rejected a challenge based on the absence of procedural safeguards during penalty phase proceedings. *People v. Rodriguez,* 42 Cal.3d 730, 777–78, 230 Cal.Rptr. 667, 726 P.2d 113 (1986) (relying on *Ramos,* 463 U.S. at 1009, n. 22, 103 S.Ct. at 3457, n. 22).

■■■ The penalty phase process followed in California is constitutionally sound even though,

> it fails to require (1) written findings as to the aggravating factors supporting a death judgment, (2) proof beyond a reasonable doubt of any such aggravating factors, (3) jury unanimity on the dispositive aggravating factors, (4) a finding that aggravating factors outweigh mitigating beyond a reasonable doubt, (5) a finding beyond a reasonable doubt that death is the appropriate penalty, and (6) appellate proportionality review.

*Id.* Following *Rodriguez,* a number of California Supreme Court opinions have concluded specifically that jury unanimity on the existence of an aggravating factor is not required. *People v. Jennings,* 46 Cal.3d 963, 988, 251 Cal.Rptr. 278, 760 P.2d 475 (1988); *People v. Miranda,* 44 Cal.3d 57, 99, 241 Cal.Rptr. 594, 744 P.2d 1127 (1987); *People v. Ghent,* 43 Cal.3d 739, 773–74, 239 Cal.Rptr. 82, 739 P.2d 1250 (1987); *People v. Allen,* 42 Cal.3d 1222, 1285, 232 Cal.Rptr. 849, 729 P.2d 115 (1986). The natural corollary to *Rodriguez* and its progeny is that trial courts also need not give guiding instructions on how a jury is to consider mitigating factors. *People v. Breaux,* 1 Cal.4th 281, 314–15, 3 Cal. Rptr.2d 81, 821 P.2d 585 (1991).

■■■ Rather, the determination of the appropriate sentence is committed to juror discretion upon presentation of relevant evidence and guiding instructions on sentencing factors. There is no additional mandate that California penalty jurors be told unanimity is *not* required for the consideration of mitigating factors.

Although Turner does not challenge this precise principle, he maintains that his jury nonetheless was confused. He argues the trial court's constitutionally unnecessary instruction that aggravating factors had to be unanimously determined beyond a reasonable doubt triggered the concomitant converse instruction that mitigating factors need not be unanimously determined beyond a reasonable doubt. Absent this guidance, he argues, the jury was led to believe that unanimity beyond a reasonable doubt was required for its consideration of mitigating factors.

The same issue raised in Turner's case was presented to the court in *Kordenbrock v. Scroggy,* 919 F.2d 1091 (6th Cir.1990). In that case, a majority of the panel members concurred that an instruction requiring unanimous agreement for aggravating factors would not necessarily have led the jury to believe that a unanimous finding was required for mitigating factors. *Id.*

> The instructions carefully stated that finding an *aggravating* factor required such agreement, but it cannot be reasonably inferred that silence as to finding a mitigating factor would likely cause the jury to assume that unanimity was also a require-

ment. Indeed it would indicate the opposite. The instructions were not misleading.

*Id.* (emphasis in original). The same result obtains here.

The instructions given by the trial court at Turner's penalty phase were within the constitutional bounds prescribed by *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973, *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235, *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171, and *Tuilaepa v. California,* 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750. The jury was instructed on the relevant mitigating and aggravating circumstances of Turner's character and the circumstances of the crime.[8]

Turner has not established and cannot establish that the omission of an instruction concerning mitigating circumstances was error. Even if the omission could be considered to be a trial error, Turner has not shown that it "worked to his *actual* and substantial disadvantage infecting the entire trial with error of constitutional dimension." *Frady,* 456 U.S. at 170, 102 S.Ct. at 1596. At most, he has raised the *possibility* that some jurors *may* have been confused. He has failed to establish the prejudice prong of the cause and prejudice test for the alleged sentencing error alleged in Claims 11 and 12 to excuse his procedural default. The claims are dismissed.

**Claim 16:** That the catchall instruction under § 190.3(k) is overbroad and unfocused and that the term "extenuate," as used in the instruction, should have been defined for the jury.

■■■ As part of the penalty instructions, the jury was told,

> In determining which penalty is to be imposed on Defendant, you shall consider all of the evidence which has been received during any part of the trial of this case . . . [¶] You shall consider, take into account, and be guided by the following factors, if applicable . . . . [¶] . . . any other circumstances [sic] which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the Defendant's character or record that the Defendant offers as a basis for the sentence less than death.

RT: 1841–42.

Turner argues the terms "circumstances," "extenuates," "gravity of the crime," and "legal excuse for the crime" embrace technical legal concepts which are meaningless to the average juror. Further, due to the defect in this instruction, combined with the instructional errors identified in several other claims, the jury was not clearly informed that *any* aspect of Turner's background could constitute a mitigating circumstance. Additionally, in the Petition, Turner alleges that one or more jurors could have interpreted the factor (k) instruction to mean that *all* of his positive attributes counted for only one mitigating circumstance. Petition, ¶ 173.

The State maintains that Turner has failed to demonstrate the jury did not understand the meaning of the factor (k) instruction or

---

8. The trial court instructed,

> You shall consider, take into account, and be guided by the following factors, if applicable. [¶] A, the circumstances of the crime of which the Defendant was convicted in the present proceedings and the existence of any special circumstance found to be true. [¶] B, the presence or absence of any prior felony conviction. [¶] C, whether or not the offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance. [¶] D, whether or not the victim was a participant in the Defendant's homicidal act or consent[ed] to the acts which led to the homicide. [¶] E, whether or not the offense was committed under circumstances which the Defendant reasonably believed to be a moral justification or extenuation for his conduct.

> [¶] F, whether or not the Defendant acted under extreme duress or under the substantial domination of another person. [¶] G, whether or not at the time of the offense the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication. [¶] H, the age of the Defendant at the time of the crime. [¶] I, any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the Defendant's character or record that the Defendant offers as a basis for the sentence less than death.
>
> RT: 1841–42.

that a different instruction would have changed the outcome of the penalty determination. The State's position has merit.

The instruction given specifically was requested by Turner's counsel. The request was entirely appropriate. In *People v. Easley*, 34 Cal.3d 858, 196 Cal.Rptr. 309, 671 P.2d 813 (1983), the court provides a directive for the procedure in trials to be conducted after that opinion.[9]

> In order to avoid potential misunderstanding in the future, trial courts—in instructing on the factor embodied in section 190.3, subdivision (k)—should inform the jury that it may consider as a mitigating fact "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" and any other "aspect of [the] defendant's character or record ... that the defendant proffers as a basis for a sentence less than death.

*Id.* at 878, n. 10, 196 Cal.Rptr. 309, 671 P.2d 813, *quoting Lockett*, 438 U.S. at 604, 98 S.Ct. at 2964–65. This procedure works to ensure that the penalty phase will be characterized by the jury's individualized determination of the appropriate sentence based on the defendant's character and the circumstances of the crime. *Zant*, 462 U.S. at 879, 103 S.Ct. at 2743–44; *Tuilaepa*, 512 U.S. at 972, 114 S.Ct. at 2634–35.

Nothing in the record or alleged in the Petition undermines the efficacy of the challenged instruction in focusing the jury on appropriate considerations. Turner's argument that it is reasonable to conclude the average juror would have difficulty comprehending the meaning of the terms used in the factor (k) instruction is both unsupported and insufficient.

The allegation is unsupported for two reasons. First, in the context of the instruction, it is clear the language of factor (k) refers to evidence tending to sway the jury in favor of leniency. Second, the jury never questioned the meaning of "extenuate" or any of the other factor (k) terms during deliberations.

The allegation is insufficient because the prejudice prong to excuse a procedural de-

fault requires more than a showing of a possibility of prejudice. By arguing that the average juror would not have understood the import of the factor (k) instruction, Turner is engaging in speculation. Rather, Turner must establish that the perceived error actually worked to his disadvantage. *Frady*, 456 U.S. at 170, 102 S.Ct. at 1595–96. It cannot be said that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1737, 52 L.Ed.2d 203 (1977), or that Turner "was denied fundamental fairness at trial." *Carrier*, 477 U.S. at 494, 106 S.Ct. at 2648 (internal quotation omitted). Claim 16 is without substantive merit, and accordingly, Turner has not and cannot establish prejudice to excuse his procedural default. The claim is dismissed.

**Claim 17:** That the trial court erred at the penalty phase for its failure to explain to the jury that the prior felony conviction factor under § 190.3(c) did not relate to the conviction of the underlying murder and robbery.

■ During the guilt phase of his trial, Turner admitted his conviction of two prior felonies, robbery and receiving stolen property. RT: 1314. After the penalty phase evidence was presented, the jury was instructed to consider a number of factors in determining the appropriate penalty, including, "the circumstances of the crime of which the Defendant was convicted in the present proceedings and the existence of any special circumstance found to be true," and "the presence or absence of any prior felony conviction." RT: 1841–42. The first of these factors tracks § 190.3(a) (factor (a)) and the second tracks § 190.3(c) (factor (c)).

Turner argues that the lack of an appropriate clarifying instruction permitted the jury to arbitrarily and capriciously triple count the underlying murder of Roy Savage in determining penalty, first as felony murder, second as a statutory special circumstance under § 190.2 making him death penalty eligible, and third as a factor in aggravation. He contends that under *Stringer v. Black*, 503 U.S. 222, 112 S.Ct. 1130, 117

---

**9.** The *Easley* directive applied to Turner's trial, which commenced on November 7, 1984.

L.Ed.2d 367 (1992), the use of a vague aggravating factor in the weighing process invalidates the sentence unless the error was harmless.

 Turner's reliance on *Stringer* is misplaced. In that case, the Court considered an invalid aggravating factor used to determine *death eligibility* under Mississippi law. *Id.* at 232, 112 S.Ct. at 1137–38. Sentence selection factors considered at the penalty phase of a California capital trial are not subject to the harmless error analysis announced in *Stringer*, since death eligibility has already been determined. *Bacigalupo*, 6 Cal.4th at 465–68, 24 Cal.Rptr.2d 808, 862 P.2d 808; *Tuilaepa*, 512 U.S. at 975, 114 S.Ct. at 2636–37. The *Stringer* test applies to those states, like Mississippi, which determine death eligibility *and* sentence selection during the penalty phase.[10]

Aside from the inapplicability of *Stringer*, nothing in either the instructions given or the trial attorneys' arguments to the jury urged or even suggested that the jury should give a single incident duplicative consideration. *See People v. Montiel*, 5 Cal.4th 877, 938–39, 21 Cal.Rptr.2d 705, 855 P.2d 1277 (1993). In *Montiel*, the penalty jury was instructed under factor (a) (the circumstances of the crime), factor (b) (the presence or absence of violent criminal activity by the defendant), and factor (c) (the presence or absence of any prior felony conviction). *Id.* at 938, 21 Cal.Rptr.2d 705, 855 P.2d 1277. The court's holding explains that

> factors (a), (b), and (c), taken together, allow the jury to consider all the offenses of which defendant was convicted in the current proceeding; [footnote omitted] all his other criminal violence, and all his felony convictions entered before the capital crime was committed. Yet nothing in the statute or parallel instructions implies that any of this matter may be considered more than once. Hence, even if one or more jurors mistakenly consider a particular criminal incident under the wrong factor, there is little risk that a reasonable jury

will give a single incident duplicative consideration.

*Id.* at 938–39, 21 Cal.Rptr.2d 705, 855 P.2d 1277 (citation omitted); *see also People v. Sanchez*, 12 Cal.4th 1, 79, 47 Cal.Rptr.2d 843, 906 P.2d 1129 (1995).

The issue of "double counting" with respect to factors (a) and (b) also was considered by the Ninth Circuit in *Bonin v. Calderon*, 59 F.3d 815 (9th Cir.1995). *Bonin* characterizes the factor (a) instruction as one which "obviously refers to the crimes for which the defendant has been convicted" and the factor (b) instruction as one "intended to refer to crimes for which the defendant has not been convicted." *Id.* at 848. Like Turner, the petitioner in *Bonin* argued the penalty instructions permitted the juries[11] to double count aggravating factors. *Bonin* holds that the petitioner's double counting argument is "foreclosed by the Supreme Court's recent holding that the version of paragraph [factor] (b) at issue here is not unconstitutionally vague." *Id. citing Tuilaepa*, 512 U.S. at 976–77, 114 S.Ct. at 2637–38.

Although *Tuilaepa* did not specifically address the factor (c) instruction, the same reasoning applied there regarding factor (b) forecloses Turner's challenge here. Like factor (b), which requires the penalty jury to consider the defendant's prior violent criminal activity, factor (c), which directs the jury to consider the defendant's prior felony convictions, "is phrased in conventional and understandable terms and rests in large part on a determination whether certain events occurred, thus asking the jury to consider matters of historical fact." *Id.* at 976, 114 S.Ct. at 2637. In this case, the factor (c) instruction appropriately directed the jury's penalty determination. It is not unconstitutionally vague.

The logic of Turner's argument fails for another reason. Under the analysis he presents, the jury would not have considered his prior convictions at all. Yet the fact of the prior convictions was prominent in the case. Turner testified about them during the guilt

---

**10.** This principle is discussed more fully in connection with Claim 20, *infra.*

**11.** William George Bonin was convicted of capital murder both in the Los Angeles County and Orange County Superior Courts.

**796**

phase and the court gave detailed instructions about the elements of each at the penalty phase. RT: 1843–44. The record reveals no indication that the jury double or triple counted the underlying murder and robbery convictions from the guilt phase proceedings in determining Turner's sentence. Turner has failed to establish prejudice under the standard enunciated in *Frady*, 456 U.S. at 170, 102 S.Ct. at 1595–96 and *Carrier*, 477 U.S. at 494, 106 S.Ct. at 2648. Claim 17 is dismissed.

**Claim 18:** That the trial court erred at the penalty phase for its failure to explain to the jury that in the event the jury could not reach a unanimous verdict of either death or life without the possibility of parole, there existed a third alternative, the impanelment of a new jury and retrial.

 Turner claims the trial court should have informed the penalty jury that it was not obligated to return a verdict in the course of the penalty instructions. Instead, the jury was instructed, "In order to make a determination as to the penalty, all twelve jurors must agree." RT: 1864.

Citing *California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987), Turner maintains that the Constitution prohibits administration of the death penalty in an arbitrary and unpredictable fashion. He also cites *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932–33, 49 L.Ed.2d 859 (1976) for the proposition that jury discretion must be suitably directed to minimize the risk of arbitrary and capricious action. He suggests that the error in Claim 18, in conjunction with several other errors, adversely skewed the jury's determination toward a death verdict. The cases relied on by Turner are inapposite.

 The fact that a penalty jury is not informed of the existence of a third alternative to its rendering of a verdict for either life without the possibility of parole or death does not render the California sentencing process arbitrary, unpredictable, or capricious. As suggested in *Gregg*, a penalty

statute withstands constitutional muster if it "ensures that the sentencing authority is given adequate information and guidance[,] . . . apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.* at 195, 96 S.Ct. at 2935. The California statute does so.

Moreover, telling a California jury the consequences of its inability to reach a unanimous verdict is foreclosed by *People v. Kimble*, 44 Cal.3d 480, 244 Cal.Rptr. 148, 749 P.2d 803, *cert. denied* 488 U.S. 871, 109 S.Ct. 188, 102 L.Ed.2d 157 (1988). *Kimble* holds "a jury should not be instructed on the consequences of its failure to reach a unanimous verdict." *Id.* at 511, 244 Cal.Rptr. 148, 749 P.2d 803. This conclusion follows because those consequences involve a *"procedural direction addressed to the trial court, not a substantive factor intended the jury's consideration."* *Id.* at 515, 244 Cal.Rptr. 148, 749 P.2d 803 (footnote omitted) (emphasis added).[12]

The policy underlying this holding is one of encouraging jurors to meaningfully participate in jury deliberations. In the absence of this policy,

> any juror inclined against a finding that death was the appropriate penalty would have realized he could prevail simply by refusing to participate in good faith in the deliberations: by remaining obdurate and causing a jury deadlock, he would have in effect a veto power over the verdict. The likelihood of a minority juror's drawing this obvious inference far outweighs defendant's speculations as to what a jury uninformed on the point might have believed—i.e., that a juror otherwise disposed against voting for death in a given case might discard his considered moral judgment simply to avoid the perceived necessity of a retrial.

*Id.*, at 515–16, 244 Cal.Rptr. 148, 749 P.2d 803.

**12.** The applicable statute in *Kimble* was § 190.4(b) of the 1977 death penalty law. Under that provision the trial court was required to impose a life sentence without parole in the

event the jury deadlocked. Under § 190.4(b) of the 1978 law, applicable in Turner's case, a trial court is to dismiss a deadlocked jury, impanel a new jury, and retry the penalty case.

While other jurisdictions may require disclosure of the consequences of a deadlock under the policy that jurors should have all available information at their disposal when confronted with a death penalty sentence selection, *see e.g. State v. Williams,* 392 So.2d 619 (La.1980) and *Kubat v. Thieret,* 867 F.2d 351 (7th Cir.1989), California's policy nonetheless is valid. The fact that different jurisdictions embrace competing, but valid governmental policies and rules for imposing the death penalty cannot undermine the legitimacy of the rule announced in *Kimble.* In *Blystone,* 494 U.S. at 309, 110 S.Ct. at 1084–85, the Supreme Court acknowledges that different forms of death penalty laws have been enacted in different states. The Court observes, "Within the constitutional limits defined by our cases, the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Id.*

Claim 18 has no merit, either standing alone, or in combination with other claims. Turner cannot establish prejudice to excuse his procedural default. The claim is dismissed.

**Claim 20:** That the trial court erred at the penalty phase for its failure to give the jury sufficient guidance to render a constitutionally valid penalty determination.

Turner describes Claim 20 as cumulative, combining the allegations of Claims 16 (that the trial court failed to adequately inform the jury it could consider mitigating aspects of Turner's background), 17 (that the trial court failed to instruct the jury not to double or triple count the underlying murder of Mr. Savage in aggravation of the sentence), and 19 (that the trial court failed to explain how the jury should consider the absence of evidence of certain sentencing factors). The cumulative effect of these errors, he argues, unconstitutionally skewed the penalty determination toward death. He claims a more favorable result is likely in the absence of the instructional errors. He asserts that the instructional errors rendered the sentencing circumstances invalid, and, relying on *Espinosa v. Florida,* 505 U.S. 1079, 1081, 112 S.Ct. 2926, 2927–28, 120 L.Ed.2d 854 (1992)

and *Clemons v. Mississippi,* 494 U.S. 738, 752, 110 S.Ct. 1441, 1450, 108 L.Ed.2d 725 (1990), that the weighing of invalid aggravating circumstances violates the Eighth and Fourteenth Amendments.

The State argues that Turner has presented nothing new relative to the issue of prejudice and that the claim therefore should be dismissed. The State also refers to its separate argument against Turner's perceived "cumulative error" claim.[13]

As the State asserts, Turner's showing of prejudice for this claim is substantially lacking. Claims 16 and 17 are resolved above, and the merits of Claim 19 are resolved below, in Part V. The conclusion with respect to each of these three claims is that the challenged instructional omission was not error of constitutional magnitude, and even if this Court considered the omission to be error, the error was not prejudicial. *See* discussion of Claims 16 and 17, *supra,* and of Claim 19, *infra.*

To the extent Claim 20 focuses on the weighing of invalid aggravating circumstances under *Espinosa* and *Clemons,* the challenge is equally unavailing. These cases stand for the proposition that vague aggravating circumstances used to determine death eligibility violates the Eighth Amendment; in each, the Supreme Court remanded the cases to the respective state supreme courts for reweighing of the evidence without the invalid aggravating circumstances. *Accord Stringer,* 503 U.S. at 232, 112 S.Ct. at 1137–38.

This Eighth Amendment line of cases does not apply in the present case because the death penalty schemes at issue in *Espinosa* and *Clemons* are distinct from the process utilized in California. In both Florida (*Espinosa* ) and Mississippi (*Clemons* ), the task of narrowing the class of death eligible murderers, as required under *Zant v. Stephens,* 462 U.S. at 877, 103 S.Ct. at 2742, occurs during the penalty phase proceedings. In California the narrowing function occurs during the guilt phase by the jury's finding of statutory special circumstances enumerated in § 190.2. *See Bacigalupo,* 6 Cal.4th at 465–68, 24 Cal.

---

**13.** See Part VI, *infra,* discussing Turner's claim of cumulative error.

Rptr.2d 808, 862 P.2d 808 (describing the death penalty process under California law and various other states); *Tuilaepa,* 512 U.S. at 975, 114 S.Ct. at 2636–37.

▇▇▇▇▇ The special circumstances set forth in § 190.2 must comport with Eighth Amendment requirements by providing objective standards for channeling jury discretion, as well as detailed specific guidance capable of rational review. *Bacigalupo,* 6 Cal.4th at 468, 24 Cal.Rptr.2d 808, 862 P.2d 808.[14] Evaluation of a statute pursuant to this Eighth Amendment standard applies to factors which circumscribe the class of *death eligible* defendants, not *penalty selection. Id.* at 475, 24 Cal.Rptr.2d 808, 862 P.2d 808. There is no need to reweigh allegedly vague aggravating factors adduced during the penalty phase in a California capital trial where the only issue is penalty selection. As noted above, in the discussion of Claims 11, 12, and 16, penalty factors need only provide guidance to the jury to make an individualized determination of penalty based on the character of the defendant and the circumstances of the crime. *Zant v. Stephens,* 462 U.S. at 879, 103 S.Ct. at 2743–44; *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2634–35. In any event, Turner simply has not established that any of the aggravating factors considered by the jury at his penalty proceedings were constitutionally vague.

Claim 20 is meritless. Turner has not and cannot establish prejudice pursuant to *Murray,* 477 U.S. at 494, 106 S.Ct. at 2648–49 and *Frady,* 456 U.S. at 170, 102 S.Ct. at 1595–96. The claim is dismissed.

**Claim 21:** That the death penalty is imposed disproportionally against African–Americans.

▇▇▇▇▇ Citing *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), Turner correctly states that to prevail on a claim of disparate racial impact he must prove that the decision makers in his case acted with a discriminatory purpose. *See id.* at 292, 107 S.Ct. at 1766–67. He then adds that he cannot meet this standard and that the *McCleskey* standard is insurmountable,

but that he wants to preserve the claim for appeal in the event the standard changes in the future.

The State seizes on Turner's concession as grounds for dismissing the claim. The State also refers to another Supreme Court case, *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), for the proposition that intercase proportionality review is not constitutionally required. *Id.* at 50–51, 104 S.Ct. at 879–80; *see also Ceja v. Stewart,* 97 F.3d 1246, 1252 (9th Cir.1996) ("[t]here is no federal right to proportionality review").

The State's position is sound. Claim 21 cannot be sustained under prevailing authority. No prejudice can be demonstrated to overcome Turner's procedural default. The claim is dismissed.

**Claim 27:** That the trial court erred for its failure to sua sponte instruct that Turner's mental state could negate the specific intent to commit robbery or murder at the guilt phase and be considered a mitigating factor at the penalty phase.

▇▇▇▇▇ Turner argues that evidence presented at the guilt phase concerning his mental capacity and intoxication obligated the trial court to instruct, sua sponte, about the relation of these conditions to the mens rea for murder and robbery. Evidence of Turner's mental state was presented by Turner's own testimony and Dr. Hamm's opinion.

Turner's testimony emphasized his drug and alcohol use throughout the day of the crime. At 6:30 in the morning, when Mr. Savage came to Fresno to collect Turner, Turner said he was already "pretty gone" from using PCP. It was for this reason that Turner engaged in little conversation during their drive to Mr. Savage's house in Merced. RT: 1334. After working a short time in Mr. Savage's yard, Turner took a break and smoked the other half of the PCP "stick" he smoked before Mr. Savage picked him up in Fresno. RT: 1339. Later in the day, upon return to Mr. Savage's house from running some errands, Turner consumed three or four glasses of brandy. RT: 1366. He and

---

**14.** In contrast, the "sole purpose of the penalty phase is to select the punishment for a defendant who has been found to be within the narrowed class of murderers for whom death would be an appropriate penalty." 6 Cal.4th at 468, 24 Cal. Rptr.2d 808, 862 P.2d 808 [citations omitted].

Mr. Savage again went out, this time to purchase some clothing for Turner, as compensation for the work he did in Mr. Savage's yard. When they returned, Turner drank more brandy. RT: 1374.

Turner testified that after Mr. Savage ate dinner, and while Turner was waiting to be driven home, Mr. Savage came downstairs in his underwear and invited Turner to have sex with him. RT: 1378. When Turner declined, an altercation broke out during which Mr. Savage hit Turner on his back with a wooden club of some kind. RT: 1379. At this point, Turner testified that he was unable to clearly recall the sequence of events. He did recall, however, leaving Mr. Savage's house and walking to a nearby supermarket to purchase a pack of cigarettes. RT: 1380. On the way, he smoked another entire "stick" of PCP. *Ibid.* As Turner lighted a cigarette from the pack he purchased, he saw Mr. Savage driving up in his car. Mr. Savage apologized; Turner asked to go back to Mr. Savage's house to retrieve his coat and money and then go home. Mr. Savage agreed. RT: 1381.

Argument about whether Turner would have sexual relations with Mr. Savage and whether he would tell anyone about Mr. Savage's request for sex continued. RT: 1382–84. Turner claims Mr. Savage initiated the physical struggle by grabbing Turner from behind. It was at this point that Turner drew his buck knife and began "sticking" it at Mr. Savage. The encounter was fatal. RT: 1386–90.

The substance of Dr. Hamm's testimony about Turner's mental state is summarized in the discussion of Claim 9, *supra.* Briefly, Dr. Hamm found Turner to have a below average native intelligence and a tendency to become disorganized under stress. He opined that Turner's use of PCP shortly before the crime exacerbated this innate condition. During the fatal attack on Mr. Savage, Turner was in the grips of hysteria, was disassociating himself from his own conduct, and was borderline psychotic. RT: 1481–82; 1499–1500; 1503.

In Claim 27, Turner contends the foregoing evidence was sufficient to require the trial court to instruct about Turner's capacity to form the mental state necessary to commit murder and robbery. He relies on *People v. Leever,* 173 Cal.App.3d 853, 219 Cal.Rptr. 581 (1985). In that case the court held that the trial court erred by not instructing on its own motion as to the relevance of the defendant's mental condition at the time of the offense. *Id.* at 865, 219 Cal.Rptr. 581.

Turner claims the trial court should have given an instruction similar to current CALJIC 3.32. At the time of his trial in 1984, the applicable instruction was former CALJIC 3.36.[15] The 1981 version of CALJIC 3.36 provides:

> Evidence has been received regarding a [mental disease] [mental defect] or [mental disorder] of the defendant at the time of the offense charged [in Count ___]. You may consider such evidence solely for the purpose of determining whether or not the defendant actually formed the mental state which is an element of the crime charged in [in Count ___] to wit _____.

The State does not contest that the trial court erred for its failure to give the omitted instruction, but argues that in light of the other instructions, Turner suffered no prejudice on account of the alleged error. The State urges that the instructions given fully presented Turner's theory of the case pointing out that the jury received instructions on all the elements of first and second degree murder, voluntary and involuntary manslaughter, the effect of a sudden quarrel or heat of passion, the honest but unreasonable belief in the need for self defense, and the manner in which circumstantial evidence is to be evaluated. While these instructions define the concepts necessary for the jury's determination of the various charged offenses, they do not expressly guide the jury's consideration of how to consider evidence of Turner's mental defect relative to the mens rea of the charged crimes.

The State, however, does not rely entirely on the instructions given at trial. To bolster its assertion of no prejudice, it also points to

---

**15.** The State provided the text of former CALJIC 3.36 in its opposition.

the closing statements of prosecution and defense counsel. The prosecutor recounted how Mr. Savage had been stabbed 40 times *after* Turner delivered a wound that caused Mr. Savage's chest to "gush" with blood. The prosecutor argued: "You have to actively go at that, to plunge a knife that many times into a body. [¶] At some time he intended to kill, even if it wasn't the first.... He was intending to kill." RT: 1673, 1674. The prosecutor also emphasized the evidence that two telephone cords in Mr. Savage's house had been cut: "He cut the cords in anticipation of the robbery. He is, according to this evidence, guilty of premeditated murder.... I think reason shows us that the Defendant did have the robbery in mind when he cut the telephone cords" RT: 1674, 1675. With respect to the jury's finding of the robbery murder special circumstance, he stressed that the jury had to believe the killing of Mr. Savage was intentional: "To say special circumstance in this case, you have to show also that it is intentional. [¶] In other words, if it were accidental in the course of a robbery, then it's first degree. But, it's not special circumstance. [¶] If it is in the course of a robbery, and it's an intentional killing, also, then you have the special circumstance." [16] RT: 1676.

Defense counsel also addressed Turner's diminished mental state to the jury. He described Dr. Hamm's assessment of Turner's mounting hysteria:

> [Dr. Hamm] presented a picture of a young man, isolated in Mr. Savage's home, isolated in a white affluent community, 50 miles from his home in Fresno. Presented a picture of the frustration of trying to get back to that home and being rebuffed each time by Mr. Savage. [¶] And picture as he described the Defendant himself, once described it of suddenly blowing up, suddenly boiling over and regressing, acting in a physical manner to this combination of circumstances that he was faced with.

RT: 1680. With respect to the number of stab wounds sustained by Mr. Savage, defense counsel continued:

> [There was] not one single disabling blow to the head. No bruises. No marks from bruising. But 40 ineffectual wounds and three or four very effectual wounds. [¶] Counsel would have you regard only the three or four effectual, the fatal wounds. I ask you also to consider the 40 ineffectual wounds. Does that speak to you or a planned attack? Upon Mr. Savage? [¶] Does that speak to you of premeditation, of intention to—of a clear, of a thought-out intention to do anything[?] I think that fact, the 40 ineffectual wounds indicate, in themselves, the nature of the claim, or, at least, of the killing that's been presented to you.

RT: 1680–81.

One additional, relevant piece of information was given to the jury which the State does not mention in its papers. At the culmination of the guilt phase, the trial court instructed: "If the evidence shows that the Defendant was intoxicated at the time of the alleged offense, *the jury should consider his state of intoxication in determining if Defendant had such specific intent.*" RT: 1641 (emphasis added); CT: 203.

This instruction contains precisely the type of language which Turner claims was omitted. Consistent with former CALJIC 3.36, it informs the jury that evidence of Turner's intoxication may be considered in determining whether or not he actually formed the mental state which is an element of the charged crimes. In light of all the other instructions and argument of counsel, the fact that the words "mental disease," "mental defect," or "mental disorder" were not used in this instruction in no way minimizes its import. The other instructions and argument of counsel addressed Turner's mental state, generally. In any event, intoxication was repeatedly underscored in the defense case. Dr. Hamm indicated that Turner had below average native intelligence and stress

---

**16.** At the time of Turner's trial, death eligibility under the robbery-murder special circumstance required proof of intent to kill. *Carlos v. Superior Court,* 35 Cal.3d 131, 138–54, 197 Cal.Rptr. 79, 672 P.2d 862 (1983) *overruled by People v. Anderson,* 43 Cal.3d 1104, 1142–45, 240 Cal. Rptr. 585, 742 P.2d 1306 (1987).

management abilities, but, it was his consumption of PCP shortly before the fatal encounter with Mr. Savage which brought him to the borderline psychotic, dissociative, and hallucinating state. Turner suffered no prejudice for the trial court's failure to give the specific guilt phase instruction proffered here.

Turner's claim of instructional omission at the penalty phase relative to his mental defect or intoxication also is ineffectual. Contrary to Turner's allegation, the penalty jury was informed that evidence of his mental disease, mental defect, and intoxication *could be considered* mitigating factors for a sentence less than death. Under § 190.3(d), the jury was instructed to consider: "whether or not the offense was committed while the Defendant was under the influence of extreme mental or emotional disturbance." RT: 1842. Under § 190.3(h), the trial court instructed: "whether or not at the time of the offense the capacity of the Defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication." *Ibid.* Finally, under § 190.3(k), as noted above, the jury was instructed to consider: "any other circumstances [sic] which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any other aspect of the Defendant's character or record that the Defendant offers as a basis for the sentence less than death." *Ibid.*

The error alleged in Claim 27 relative to the guilt phase instructions was not prejudicial. The perceived error relative to the penalty instructions did not occur. Claim 27 is dismissed.

**Claim 34:** That the 1978 Death Penalty Statute does not adequately narrow the class of death eligible defendants because a jury finding on robbery serves as the predicate for a first degree felony murder conviction, a robbery murder special circumstances finding, and a sentence selection circumstance of the crime.

Turner's claim is founded on the principle that death penalty schemes must distinguish between "the few cases in which it [the death penalty] is imposed from the many cases in which it is not." *Furman v. Georgia,* 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring); *Lewis v. Jeffers,* 497 U.S. 764, 775, 110 S.Ct. 3092, 3099, 111 L.Ed.2d 606 (1990). This differentiation is accomplished by channeling the jury's discretion using objective standards capable of appellate review, *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980), most commonly by findings of specifically defined "aggravating circumstances."

As noted elsewhere in this Memorandum, the narrowing "aggravating circumstances" in California are designated "special circumstances," and are specifically defined in § 190.2 of the 1978 Death Penalty Statute. *Tuilaepa,* 512 U.S. at 975, 114 S.Ct. at 2636–37. The narrowing process takes place at the guilt phase of the trial by the jury's unanimous finding true of at least one special circumstance beyond a reasonable doubt. *Id.; Bacigalupo,* 6 Cal.4th at 467–68, 24 Cal.Rptr.2d 808, 862 P.2d 808; *see also* § 190.4(a).

The proceedings at Turner's trial complied with these requirements. The trial court instructed:

> If you find the Defendant in this case guilty of murder of the first degree, you must then determine if murder was committed under the following special circumstance in the commission or attempted commission of robbery. [¶] A special circumstance must be proved beyond a reasonable doubt. If you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find that it is not true.

RT: 1657. In accordance with the controlling California authority at the time of his trial, the jury also was instructed that the special circumstance finding required proof of Turner's intent to kill Mr. Savage:[17]

---

17. The decision in *Carlos,* 35 Cal.3d at 138–54, 197 Cal.Rptr. 79, 672 P.2d 862, requiring this finding was overruled four years later in *Anderson,* 43 Cal.3d at 1142–45, 240 Cal.Rptr. 585, 742 P.2d 1306. See note 16, *supra.*

To find that the special circumstance, referred to in these instructions as murder in the commission of robbery, is true, it must be proved, first, that the murder was committed or attempted commission of a— excuse me, was engaged in the commission or attempted commission of robbery. [¶] *Second, that the Defendant intended to kill a human being.* Third, that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom or to avoid detection.

*Ibid.* (emphasis added).

Turner complains that the class of death eligible defendants in California is not legitimately narrowed because the same predicate offense, robbery, can be used to obtain a conviction of felony murder, find true the robbery murder special circumstance, and constitute an aggravating circumstance during sentence selection. He alleges the California death penalty scheme compelled his death sentence merely on the finding that he had the intent to commit robbery.

Turner's argument misstates the facts of his trial and evinces a misconstruction of the law regarding the constitutionally required narrowing function of death penalty laws. The misstatement of the facts derives from his argument that he received the death sentence merely on the showing of his intent to commit robbery. Even assuming that the jury's verdict of first degree murder was predicated on felony murder rather than on premeditated murder, the robbery murder special circumstance finding required the jury to find that Turner intended to kill Mr. Savage. *See* RT: 1676 (the prosecutor's argument quoted in Claim 27, *supra*); RT: 1657 (the actual instruction requiring intent to kill before the robbery murder special circumstance can be found true, quoted above on the previous page). This portion of Claim 34 is factually inaccurate and is rejected on that basis.

Turner's argument also misconstrues the law because he assumes that the narrowing process of distinguishing between the cases in which the death penalty is and is not imposed continues into penalty phase proceedings. It does not. Narrowing occurs for the purpose of determining death eligibility. Once death eligibility is determined, the penalty phase proceeds for the purpose of sentence selection, characterized by the jury's individualized determination of the appropriate penalty for a particular defendant. The narrowing process is subject to different Eighth Amendment requirements than sentence selection.[18] While the former requires objective standards to channel jury discretion, *Godfrey*, 446 U.S. at 428, 100 S.Ct. at 1764–65, the latter must allow the jury to subjectively consider "relevant subject matter" in "understandable terms," *Tuilaepa*, 512 U.S. at 976, 114 S.Ct. at 2637. The discussion regarding the California statutory scheme in Claims 11, 12, 16, and 20 concludes that the sentence selection at the penalty phase of Turner's trial satisfied the requirements established by the United States Supreme Court.

The narrowing process that took place at the guilt phase of Turner's trial also fulfills the constitutional requirement under *Furman* of distinguishing between those who are and are not eligible for the death penalty. The California Supreme Court holds:

> Whether or not we approve of the wisdom of the statutory classification, it appears to be generally accepted that by making the felony murderer but not the simple murderer death-eligible, a death penalty law furnishes the "meaningful basis [required by the Eighth Amendment] for distinguishing between the few cases in which [the death penalty] is imposed from the many in which it is not."

*Anderson,* 43 Cal.3d at 1147, 240 Cal.Rptr. 585, 742 P.2d 1306, *quoting Furman,* 408 U.S. at 313, 92 S.Ct. at 2764 (brackets in original). No grounds for upsetting this determination are advanced in this proceeding.

---

**18.** In Turner's moving papers, he also argues the California statutory scheme contains so many special circumstances that nearly all murder defendants can become death eligible. He has not alleged this deficiency in the Petition. Nor does he argue that the number of statutory special circumstances under § 190.2 at the time of his trial rendered invalid or unconstitutional the determination of *his* death eligibility. The contention will not be considered further.

This Court concurs that qualifying a person who has committed murder in the course of a robbery for the death penalty, but sparing a person who commits simple premeditated murder from the same fate, adequately narrows the class of murderers eligible for the death penalty.

Claim 34 is substantively without merit. Accordingly, Turner has not and cannot establish prejudice or a fundamental miscarriage of justice to excuse his procedural default of this claim. Claim 34 is dismissed.

**Claim 36:** That counsel was ineffective for failure to request and the trial court erred for its failure to provide special verdict forms requiring the jury to find (1) intent to kill before determining the truth of the robbery murder special circumstance at the guilt phase and (2) the identity of aggravating factors found unanimously, beyond a reasonable doubt to outweigh the mitigating factors at the penalty phase.

At the guilt phase of Turner's trial, the foreman signed a verdict form setting forth the following information:

> We the jury in the above entitled cause, find the defendant Thaddaeus Louis Turner guilty of First Degree Murder, a violation of Section 187 of the Penal Code, a felony, Count I of the Information.
>
> We have determined the existence or non-existence of the charged Special Circumstance by marking YES or NO as follows: That THADDAEUS LOUIS TURNER, the defendant, committed the murder while the defendant was engaged in the commission of, or attempted commission of, Robbery, a violation of Section 211 of the Penal Code.
>
> X YES ___ NO

CT: 259.

At the penalty phase, the foreman signed a verdict form in the following form:

> We the jury in the above-entitled cause, having determined that the defendant is

guilty of murder in the first degree as charged in the Information, and further having found the existence of special circumstances, do hereby determine that the punishment should be:

> X Death
> Life imprisonment without possibil-
> ___ ity of parole.

CT: 296.

 Turner alleges the guilt phase verdict form was inadequate because it did not require the jury specially to find that he intended to kill as required by *Carlos*, 35 Cal.3d at 138–54, 197 Cal.Rptr. 79, 672 P.2d 862. He does not dispute that the jury was appropriately instructed on the intent to kill requirement, only that the verdict form did not include this language. The jury *was* told the robbery murder special circumstance required a finding that Turner intended to kill. RT: 1657 (the text of which is set out in the preceding Claim 34).

 Turner incorrectly presumes that the special circumstance determination requires the finding of evidentiary facts. Section 190.4(a) provides that when the jury returns a verdict of guilt on the charge of first degree murder, it shall also make a finding of the truth of the special circumstances alleged pursuant to § 190.2. The jurors are "to reach a conclusion as to whether or not the charged special circumstance is true by applying legal principles on which they are instructed to the evidence presented to them." *People v. Davenport,* 41 Cal.3d 247, 274, 221 Cal.Rptr. 794, 710 P.2d 861 (1985). Under California law, "the statutory purpose [of § 190.4] is served by what the statutory language calls for: a finding of the *truth* or lack of truth of each circumstance, not of the facts upon which that finding is based." *Id.* at 275, 221 Cal.Rptr. 794, 710 P.2d 861 (emphasis in original).[19] The challenge to the special circumstance finding in *Davenport* is analogous to Turner's here.

---

**19.** The court in *Davenport* distinguishes requirements for special circumstance findings under § 190.4 from special verdicts under §§ 1150 and 1152. Section 1150 requires the jury in a criminal case to render a general verdict, except when there is "doubt as to the legal effect of the facts proved." Section 1152 clarifies that under a special verdict the jury makes conclusions of fact and leaves the ultimate judgment to the trial court. As quoted in the text, § 190.4 requires less—the truth of the special circumstance, not the underlying facts. 41 Cal.3d at 274, 221 Cal. Rptr. 794, 710 P.2d 861.

In *Davenport,* the jury found " 'that the special circumstance exists, to wit: murder involving the infliction of torture as alleged in the information.' " *Id.* at 273, 221 Cal.Rptr. 794, 710 P.2d 861. On appeal the defendant complained that the torture murder special circumstance *finding,* made pursuant to § 190.4, was insufficient because the verdict form failed to specify the jury's finding of two "essential elements" required in § 190.2(a)(18) which *defines* this circumstance. *Id.* Under § 190.2(a)(18), as applicable to that case, the torture murder special circumstance was defined as a murder that "was intentional and involved the infliction of ... extreme physical pain." *See* 41 Cal.3d at 273, 221 Cal.Rptr. 794, 710 P.2d 861. Although the jury was to make a determination that the murder was intentional and involved the infliction of extreme physical pain, the special circumstance finding under § 190.4 on the verdict form required only that the jury record its ultimate conclusion that the circumstance was true. The decision in *Davenport* thus clarifies that § 190.4 does not require a recitation of the evidentiary basis for the circumstance finding.

Similarly, in Turner's case, the jury was adequately instructed pursuant to *Carlos* that the robbery murder special circumstance required intent to kill. The ultimate finding was simply that the circumstance was true based on the evidence presented and the instructions given. The verdict form provided the jury was not part of the deliberation process. It was the culmination of juror deliberations.

Even if the absence of the proffered language on the verdict form was a technical error, no prejudice resulted. Based on the evidence presented, the jury reasonably could have determined Turner intended to kill Mr. Savage. The prosecutor stressed this very point during his closing statement. As noted in the discussion of Claim 27, *supra,* the prosecutor argued that for Turner to stab Mr. Savage over 40 times, he had to "actively" and intentionally plunge his knife into Mr. Savage's body. RT: 1673, 1674. While it is true, as Turner points out, that infliction of repeated stab wounds could indicate an explosive outburst rather than a cal-culated plan to kill, this Court must view the evidence "in the light most favorable to the prosecution." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Viewed in that light, this Court must accept that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (citation omitted). In Turner's case, it is reasonable to conclude that the jury did not believe his version of the events respecting his intent or lack of intent to kill.

█ Turner's challenge to the penalty verdict form also is unavailing. As pointed out in the discussion of Claims 11, 12, 16, 20, and 34, the penalty phase proceedings at Turner's trial were constitutionally adequate. There is no constitutional mandate that sentence selection be characterized by the stringent requirements of death eligibility narrowing. All that is required at the sentence selection stage is for the jury to receive guidance to make an individualized determination of the appropriate penalty based on the character of the defendant and the circumstances of the crime. *Zant v. Stephens,* 462 U.S. at 879, 103 S.Ct. at 2743–44; *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2634–35. Accordingly, the penalty verdict form is not infirm for failing to specify that aggravating factors must outweigh mitigating factors beyond a reasonable doubt.

Turner has failed to establish that Claim 36 has merit or that he has suffered prejudice on account of the perceived errors. The claim is dismissed.

## V. Analysis of Improperly Defaulted Claims

The following three claims were erroneously defaulted by the California Supreme Court. Since they are properly before this Court, their relative merits will be evaluated and resolved.

**Claim 10:** That the trial court erred at the penalty phase for its failure to instruct the jury to consider the presence or absence of violent criminal activity as a sentencing factor.

█ Toward the end of the penalty phase of Turner's trial, both counsel and the court

engaged in a conference regarding jury instructions. Among the instructions discussed was CALJIC 8.84.1 which tracks the statutory language of § 190.3 and lists the factors a jury is to consider in determining penalty. The version of CALJIC 8.84.1 submitted by Turner's counsel specifically omitted reference to factor (b), the presence or absence of violent criminal activity.

> THE COURT: Is the form you submitted different than the form that was submitted by the District Attorney?
>
> MR. ELLERY [defense counsel]: I believe I deleted things I felt were not to be shown, that would not be shown in this—in this trial.
>
> THE COURT: All right. You deleted "the presence or absence of criminal activity by the Defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence."
>
> MR. HALLFORD [the prosecutor]: *Seems like that would be a mitigating factor in the absence of it, might want to consider it.* I shouldn't be saying that to him, but it seems like he's rejecting a mitigating factor.

RT: 1827–28 (emphasis added). Although defense counsel at first appeared to equivocate ("I'd—I've offered it without that, your Honor. You both give me pause to think. But I—." RT: 1828), he did not thereafter change his position to include the violent criminal activity factor and the trial court did not give the instruction.

■■■■■ On direct appeal, the California Supreme Court determined counsel's action in purposefully omitting the factor (b) instruction implicated the invited error doctrine. *Turner,* 50 Cal.3d at 712, 268 Cal. Rptr. 706, 789 P.2d 887 ("In the first place, any 'error' was invited by defendant himself."). Under California law, the invited error doctrine bars argument on appeal that an instruction was omitted in error where counsel's decision to forego the instruction resulted from a "conscious, deliberate tactical choice." *People v. Wader,* 5 Cal.4th 610, 657–58, 20 Cal.Rptr.2d 788, 854 P.2d 80 (1993). In the present case, the state high court found that defense counsel's decision to leave out the factor (b) instruction was deliberate and tactical. *Turner,* 50 Cal.3d at 712, 268 Cal.Rptr. 706, 789 P.2d 887. "Even a deliberate tactical choice by counsel, however, may be an incompetent one." *Wader,* 5 Cal.4th at 658, 20 Cal.Rptr.2d 788, 854 P.2d 80.[20] The successful presentation of an ineffective assistance of counsel claim may negate the effect of the invited error doctrine for alleged trial error by providing an alternative basis for habeas relief.[21]

■■■■■ Focusing solely on the trial error challenge presented in Claim 10,[22] the standard for granting habeas relief requires a showing of actual prejudice. *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1721–22, 123 L.Ed.2d 353 (1993). That is, the claimed error must have had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946). A claim presenting a jury instruction misdescription or omission is subject to the *Brecht* harmless error standard. *California v. Roy,* —— U.S. ——, ——, 117 S.Ct. 337, 339, 136 L.Ed.2d 266 (1996).

**20.** Although the California Supreme Court determined defense counsel's tactical purpose in omitting the factor (b) instruction was valid, 50 Cal.3d at 712, 268 Cal.Rptr. 706, 789 P.2d 887 [citation omitted], this Court need not confirm or reject this assessment. The adequacy of defense counsel's representation is not presently before the Court. The finding of the California Supreme Court on this issue is not dispositive to a determination of whether there was *trial error* in failing to give the omitted factor (b) instruction. Whether defense counsel performed competently will be evaluated in connection with the claims alleging ineffective assistance of counsel.

**21.** In Claim 5 of the Petition, Turner specifically alleges that his counsel was constitutionally ineffective for withdrawing the factor (b) instruction from the jury's consideration. Petition: 34:15–29, ¶ 111(6).

**22.** As noted in footnote 3 of Part II of this Memorandum, the State has not raised the invited error doctrine as a basis for procedural default. Any such argument is considered waived. *Batchelor,* 693 F.2d at 864.

In Turner's case, there was no prejudice resulting from the trial court's failure to correct the alleged error of defense counsel in omitting the factor (b) instruction. By stipulation, Turner informed the jury he had prior convictions for robbery and receiving stolen property. Turner now claims that his role in both of these crimes was passive. He was the "look out man" in the prior robbery of a liquor store and did not himself use a weapon. Rather, Turner's accomplice in that crime brandished a firearm. Similarly Turner's receipt of stolen property was totally nonviolent. Petition, 10:28–11:4, ¶ 38. No evidence at Turner's trial was presented as to his actual role in these crimes.[23] All the jury had was the fact of the convictions and, at the request of the prosecutor, an instruction describing the elements of each.[24]

> Pertinent here is the robbery instruction: The crime of robbery is the taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear and with the specific intent permanently to deprive such person of the property. [¶] In order to prove the commission of the crime of robbery, each of the following elements must be proved. First that a person had possession of property of some value, however slight. [¶] Second, that such property was taken from such person or from his immediate presence. Third, that such property was taken against the will of such person. [¶] Fourth, that the taking was accomplished by either *force or violence or by fear or intimidation or by both.* And, fifth, that such property was taken with the specific intent permanently to deprive such person of the property.

RT: 1843 (emphasis added).

Given the information provided the jury, particularly the definition of robbery involving the use of "force or violence" or "fear or intimidation or by both," the omitted factor (b) instruction about the *absence* of prior violent criminal activity, had it been given, would have been properly disregarded by the jury. It cannot be said that the omission of this instruction had a substantial effect in determining the jury's verdict. Claim 10 is without substantive merit and is denied.

**Claim 19:** That the trial court erred at the penalty phase for its failure to inform the jury that the absence of evidence relative to particular mitigating factors could not be considered as an aggravating factor.

██ At the penalty phase, the trial court instructed the jury to consider Turner's prior convictions (factor (c)), whether Mr. Savage had any role in the acts which led to the homicide (factor (e)), whether Turner reasonably believed his actions were morally justified or an extenuation of his conduct (factor (f)), and whether Turner acted under extreme duress or the substantial domination of another person (factor (g)). RT: 1841–42. With respect to factors (c), (e), and (f), the prosecutor argued the evidence presented at trial militated in favor of aggravation of Turner's sentence.

> Relative to factors (c) and (e), he argued: What are some of the circumstances? One, the absence—presence or absence of any prior felony convictions. That's pretty obvious. The Defendant himself admitted those on the stand. He had a robbery for which he was sent to a state institution. After that, he was sent to prison, again, for receiving. [¶] And he only got out of that prison in September of 1983, within six months, seven months, he was involved in this, what I term as a grisly murder. And I think that's proper term for it. A very brutal and grisly murder. [¶] Another factor is whether or not the victim was a participant in the Defendant's homicidal

---

**23.** Turner alleges that the only condition upon which his counsel offered the admission of the prior felonies at the guilt phase was that no details of the crimes would be disclosed. Petition, 10: 26–28, ¶ 38. No further background about these prior felonies was offered at the penalty phase.

**24.** The fact that a full description and definition of Turner's prior convictions was offered to the jury is curious in light of the fact that the prosecutor was not called upon to *prove* these crimes. *Cf. Davenport,* 41 Cal.3d at 280–82, 221 Cal.Rptr. 794, 710 P.2d 861 (discussing the necessity of defining and proving prior criminal violent acts which did not result in a conviction under § 190.3(b)).

conduct or consented to the homicidal act. [¶] Obviously that is not a mitigating factor. There is no indication that the victim was involved in the homicidal conduct. He was running. He was stabbed in the back. He didn't get involved in it in any way whatsoever, as far as the homicide is concerned. [¶] Of course, the Defendant would have us believe another factor was involved. Another, so it seems to me that the two that I've mentioned are aggravating factors weighing against the Defendant.

RT: 1848–49.

He continued, arguing about the aggravating nature of factor (f):

Another aggravating factor is whether or not the offense was committed under circumstances that the Defendant reasonably believed to be [a] moral justification or extenuation of his conduct. [¶] Well, he has tried to offer you a reason. Unfortunately, there was robbery. Unfortunately for him, and his story, it's just unbelievable what he told you about the sexual attack. And that was the only reason, and there was no robbery motive. [¶] In the first place, you've already made that decision, so I won't rehash that. You know that one, the Defendant—the victim was fully clothed, if you saw the tape, you know that he was buckled up, his shoes on. There's no indication he was making any particular overt attack of any sort and I'm sure you've come to that decision. [¶] You've also considered the fact that the Defendant cut the wires. No blood on it. Obviously before the crime. And he had the factor of robbery in his mind before this stabbing. [¶] I doubt that we could say that he held there was a moral justification or extenuation of his conduct.

RT: 1849–50.

By these arguments, the prosecutor did not argue the *absence* of evidence rendered those factors aggravating. He *argued* the evidence, and made his pitch to the jury that the evidence implicated by those factors should be considered in aggravation. Defense counsel also brought up Mr. Savage's

participation in the events leading to the homicide under factor (e) and Turner's belief in a moral justification under factor (f).[25] He reminded the jury that the evidence suggested Mr. Savage did have homosexual encounters and that Turner's version of the facts was credible. RT: 1856.

■ In the adversary system, opposing counsel are permitted to present valid arguments as to the significance of sentencing factors. *See Tuilaepa,* 512 U.S. at 977, 114 S.Ct. at 2637–38. "Competing arguments by adversary parties bring perspective to a problem, and thus serve to promote a more reasoned decision, providing guidance as to a factor jurors most likely would discuss in any event." *Id.* The claimed improper prosecutorial argument did not occur with respect to the factor (c), (e), and (f) instructions. Under Turner's theory, no admonition by the trial court was required.

■ The prosecutor's argument concerning the factor (g) instruction, however, is distinct. The prosecutor argued:

Another factor that you're to consider is whether or not the Defendant acted under extreme duress or under the substantial domination of another person. Obviously not. There was no other person around. [¶] There was no one else urging him to do the thing he did. No one urging him to take the T.V., the stereo or anything of that sort. No one urging him to sink that knife into the victim 40, 45 times. That is an—obviously an aggravating factor which you could—should consider.

RT: 1850.

In view of this argument, Turner maintains that the trial court's failure to inform the jury that the absence of mitigating evidence could not be considered an aggravating factor was prejudicial error. In support of this claim, Turner relies on the decision in *Davenport,* 41 Cal.3d at 289, 221 Cal.Rptr. 794, 710 P.2d 861, which determined it to be improper for the prosecutor to argue that the absence of a mitigating factor should be considered an aggravating factor.

---

**25.** Defense counsel offered no argument concerning the fact of Turner's prior convictions in

an apparent concession that this factor is aggravating.

808

Subsequent California capital cases also have determined that such argument is improper, *see People v. Siripongs,* 45 Cal.3d 548, 583, 247 Cal.Rptr. 729, 754 P.2d 1306 (1988) and *People v. Hamilton,* 48 Cal.3d 1142, 1184, 259 Cal.Rptr. 701, 774 P.2d 730 (1989), including Turner's direct appeal, *Turner,* 50 Cal.3d at 714, 268 Cal.Rptr. 706, 789 P.2d 887. In all of these subsequent cases, however, the court determined the prosecutorial impropriety to be without prejudice. *Siripongs,* 45 Cal.3d at 583, 247 Cal.Rptr. 729, 754 P.2d 1306; *Hamilton,* 48 Cal.3d at 1184–85, 259 Cal.Rptr. 701, 774 P.2d 730; *Turner,* 50 Cal.3d at 714, 268 Cal.Rptr. 706, 789 P.2d 887.

On Turner's direct appeal, the California Supreme Court noted before reaching the merits that Turner had failed to preserve his challenge, having raised no objection to the prosecutor's comments at trial. *Turner,* 50 Cal.3d at 713, 268 Cal.Rptr. 706, 789 P.2d 887. The court continued, "prompt admonitions would have cured any prejudice." *Id.* This statement implicates Turner's failure to comply with the contemporary objection rule under Evidence Code § 353.[26] *Accord People v. Visciotti,* 2 Cal.4th 1, 51–52, 5 Cal. Rptr.2d 495, 825 P.2d 388 (1992); *People v. Gates,* 43 Cal.3d 1168, 1185, 240 Cal.Rptr. 666, 743 P.2d 301 (1987); *Easley,* 34 Cal.3d at 869, 196 Cal.Rptr. 309, 671 P.2d 813.

Notwithstanding Turner's failure to preserve his objection, the court reached the merits and agreed the prosecutor's argument was improper.[27] The court nonetheless rejected Turner's contention of prejudice. *Turner,* 50 Cal.3d at 714, 268 Cal.Rptr. 706,

789 P.2d 887. First, it held, the jury was instructed to consider a particular sentencing factor only if it was applicable. *Id.; see* RT: 1841, quoted above at footnote 8 relative to Claims 11 and 12. Second, the court emphasized that the jurors understood the discretion vested in them and their responsibility to determine the appropriate penalty. 50 Cal.3d at 714, 268 Cal.Rptr. 706, 789 P.2d 887. Third, quoting *People v. Hamilton,* 48 Cal.3d 1142, 1184, 259 Cal.Rptr. 701, 774 P.2d 730 (1989), the court " 'assumed reasonable jurors would understand how to evaluate the absence of particular mitigating factors.' " 50 Cal.3d at 714, 268 Cal.Rptr. 706, 789 P.2d 887. Finally, the court noted that the aggravating evidence presented in the case was overwhelming and that the prosecutor's mischaracterizations did not likely affect the penalty verdict. *Id.*

In connection with the high court's determination the jurors understood their sentencing discretion and responsibility, the court stressed that the jury was instructed under factor (k) to consider "any other aspect of the Defendant's character or record that the Defendant offers as a basis for the sentence less than death" as required by *Easley,* 34 Cal.3d at 878, n. 10, 196 Cal.Rptr. 309, 671 P.2d 813. *Turner,* 50 Cal.3d at 710, 268 Cal.Rptr. 706, 789 P.2d 887; RT: 1842. The trial court also instructed the jury to disregard evidence of any aggravating factor unless unanimously agreed upon beyond a reasonable doubt. RT: 1847. The high court found "[t]hese instructions implied that the penalty determination required extreme responsibility and

26. California Evidence Code § 353 states in pertinent part:

A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion.

The State did not assert Turner's failure to preserve this objection as a ground for procedural default. It is now waived. *Batchelor,* 693 F.2d at 864. In any event, the California Supreme Court reached the merits of this claim on direct appeal and based its rejection of the claim on substantive rather than procedural inadequacies.

27. According to the California Supreme Court, the prosecutor referred to the absence of a mitigating factor as aggravating three times: first, in relation to the factor (e) instruction (whether the jury believed Mr. Savage was a participant in his own homicide) second, with respect to the factor (f) instruction (whether Turner believed his killing of Mr. Savage was morally justified), and third, relative to the factor (g) instruction (whether Turner committed the homicide under extreme duress of domination of another). *Turner,* 50 Cal.3d at 714, 268 Cal.Rptr. 706, 789 P.2d 887. As noted, in this Court's review of the transcript, only the prosecutor's reference to factor (g) (extreme duress or domination) improperly urged the jury to transform the absence of *any* evidence into an aggravating factor.

reliability in the evaluation of aggravating factors, yet was a broad inquiry demanding sympathetic concern for all subjectively extenuating factors of the defendant's life and character." *Turner,* 50 Cal.3d at 710, 268 Cal.Rptr. 706, 789 P.2d 887.

The analysis of the California Supreme Court is not undermined in the least by Turner's argument in this proceeding. The failure of the trial court to inform the jury that the absence of mitigating factors can *never* be transformed into aggravating factors, even in view of the prosecutor's argument, was not error. The penalty phase of Turner's trial was characterized by the jury's individualized determination of the appropriate sentence based on the character of the defendant and the circumstances of the crime. *See Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965; *Zant v. Stephens,* 462 U.S. at 879, 103 S.Ct. at 2743–44; *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2634–35. No more is constitutionally required.

 if the omission could be considered an error, it did not result in the quantum of prejudice required under the *Brecht* standard (a "substantial and injurious effect" on the jury's verdict). 507 U.S. at 637, 113 S.Ct. at 1722. The instructions, combined with the argument of counsel properly directed the jury's sentencing discretion.

Defense counsel emphasized that the level of certainty reached by the jury should be higher for returning a death penalty sentence than for returning a conviction: "[C]onsidering the permanence of the death penalty, may—it may be appropriate to be a little more certain, eliminate even the possible doubts." RT: 1853. Defense counsel then proceeded to expound upon all the aspects of the crime which created doubt about Turner's motives, intent, and culpability. First counsel reiterated that though a television was taken, the hand held remote control was left behind. RT: 1853–54. Second, he reminded the jury that the evidence suggested someone had been in the house after Mr. Savage was killed, but before the police came. He pointed out that the coverings Turner had placed over Mr. Savage had been altered, that someone had attempted to mop up some of the blood in the vicinity where

Mr. Savage's body was found, and that the authorities had not accounted for a great deal of the property said to have been missing from Mr. Savage's home. RT: 1854, 1855. Third, he suggested that Turner's premeditated robbery motive was doubtful since he took the television that was upstairs, rather than the television more easily accessible downstairs. RT: 1854–55. Defense counsel closed with the comment that the instruction on how to weigh the various factors is vague: "I think the law fails to give you much definition at this point. I think a lot is left up to you." RT: 1858. Similarly, the prosecutor informed the jury that weighing was not a mechanical process. He stated the law "doesn't say what weight you give to each factor. And ultimately it's up to you." RT: 1860.

 This information, coupled with the instructions, is sufficient to inform the jury of its sentencing discretion and responsibility. The sentencer must be given the opportunity to give "independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation." *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965. There was no error in the omission of the instruction proffered by Turner in Claim 19. Even if there had been error, the error was not prejudicial. Claim 19 is denied on the merits.

**Claim 30:** That the 1978 Death Penalty Statute is unconstitutionally vague because it fails to provide guidance as to how one class of factors can outweigh another.

 After both counsel delivered their closing statements, the trial court instructed the jury under CALJIC 8.84.2, which incorporates the statutory language of § 190.3:

It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without the possibility of parole, shall be imposed on Defendant. [¶] After having heard all of the evidence and after having heard and considered the arguments of Counsel, you shall take in—you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been in-

structed. [¶] *If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. [¶] However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole.*

RT: 1863–64 (emphasis added); *see also* CT: 286.

Focusing particularly on the italicized portion of this passage, Turner complains the instruction is constitutionally deficient for failure to suitably guide the jury's determination of sentencing factors. In *People v. Brown,* 40 Cal.3d 512, 230 Cal.Rptr. 834, 726 P.2d 516 (1985), *rev'd on other grounds sub nom. California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), the California Supreme Court found this same "outweigh ... shall" language in § 190.3 confusing. *Id.* at 544, n. 17, 230 Cal.Rptr. 834, 726 P.2d 516. The court recommended that in future capital cases trial courts "should instruct the jury as to the scope of its discretion and responsibility in accordance with the principles set forth in this opinion." *Id.* The court advised that the following language, then being considered for insertion into CALJIC 8.84.2, would conform to its opinion:

> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical weighing of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To

return a judgment of death each of you must be persuaded that the aggravating evidence [circumstances] is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

*Id.* at 545, n. 19, 230 Cal.Rptr. 834, 726 P.2d 516 (brackets in original).

■ The absence of this explanatory language from sentencing instructions, however, does not render a death sentence unconstitutional. As noted above in the discussion of Claims 11, 12, 16, 20, and 34 from Part IV, and Claim 19 from Part V, the Supreme Court has stated: "What is important at the selection stage is an *individualized* determination on the basis of character of the individual and the circumstances of the crime." *Zant v. Stephens,* 462 U.S. at 879, 103 S.Ct. at 2744; *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. at 2634–35. The only requirement for fulfilling the mandate of individualized sentencing is to allow the jury to "consider all relevant mitigating evidence." *Boyde v. California,* 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990) *quoting Blystone,* 494 U.S. at 307, 110 S.Ct. at 1083–84. That mandate is fulfilled here as it was in *Boyde.* In *Boyde* the Court rejected the same challenge now asserted by Turner "because the mandatory language of CALJIC 8.84.2 is not alleged to have interfered with the consideration of mitigating evidence." *Boyde,* 494 U.S. at 377, 110 S.Ct. at 1196.[28] Turner has not asserted such an allegation here either.

■ The California Supreme Court also rejected Turner's challenge because (1) the jury was instructed to disregard evidence of an aggravating factor "unless the jury unanimously found it true beyond a reasonable doubt" and (2) the jury received the factor (k) instruction. 50 Cal.3d at 710, 268 Cal. Rptr. 706, 789 P.2d 887; *see* discussion of the factor (k) instruction in connection with Claims 16 and 19, above. These instructions

---

**28.** The Supreme Court in *Boyde* further rejected the petitioner's suggestion that the jury should be free to opt for a life sentence even where the aggravating factors outweigh those in mitigation. "[T]here is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consider-

ation of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" 494 U.S. at 377, 110 S.Ct. at 1196, *quoting Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988).

indicate that the jury's "penalty determination required extreme responsibility and reliability in the evaluation of aggravating factors, yet was a broad inquiry demanding sympathetic concern for all subjectively extenuating factors of defendant's life and character." *Id.* (citation omitted).

Even Turner concedes that in many cases decided after *Brown,* the California Supreme Court has not found the absence of the recommended explanatory instructions to be reversible error.[29] Indeed, *Brown,* .itself did not find the bare statutory language of § 190.3 in the instruction to require reversal. Without citing *Boyde,* or referring the analysis of the California Supreme Court in his direct appeal, Turner nonetheless claims the absence of the additional explanatory language was prejudicial in *his* case because of the prosecutor's closing argument. He claims the prosecutor unconstitutionally urged the death penalty was "obvious" if aggravating circumstances outweighed mitigating circumstances. Citing *People v. Milner,* 45 Cal.3d 227, 246 Cal.Rptr. 713, 753 P.2d 669 (1988), he argues the bare statutory language of § 190.3 together with prosecution argument emphasizing the mandatory language can be considered prejudicial.

Turner's reliance on *Milner* is misplaced. While the court in *Milner* did reverse a death sentence, the court's sentence reversal was predicated on a particular tactic employed by the prosecutor during closing argument. The prosecutor in *Milner* informed the jurors that the law protected them from shouldering the responsibility for determining the defendant's fate. *Id.* at 253–54, 246 Cal.Rptr. 713, 753 P.2d 669. He argued all the jurors had to do was apply the sentencing factors and that they should refrain from interjecting their personal feelings and subjective beliefs into the decision making process. *Id.* at 254, 246 Cal.Rptr. 713, 753 P.2d 669. Because the jurors were left with the impression that they had merely to weigh the sentencing factors without regard to their individual personal conclusion about whether the death penalty was appropriate, the bare statutory language of § 190.3 in CALJIC

8.84.2 was too misleading to sustain the death sentence. *Id.* at 256–57, 246 Cal.Rptr. 713, 753 P.2d 669.

The prosecutor's closing argument in the present case in no way replicates the prejudicial declaration in *Milner.* Rather than negate each juror's personal responsibility in assessing the propriety of the death penalty, the prosecutor here argued the weight the jury chose to assign to each sentencing factor *was* a personal decision:

> If we count under the law, the mitigating factors and the aggravating factors, if we just count them, one, two, three, four, and add them up, the chances are you'll find that there are more aggravating factors than mitigating factors in this case. *But the law doesn't make it that simple.* [¶] *It doesn't say what weight you give to each factor. And ultimately it's upon you.* But, if you simply look at those factors and add them up, mechanically, you'll probably see there are more aggravating factors against the Defendant than [there] are mitigating factors.

RT: 1860 (emphasis added). The prosecutor's argument also did not steer the jury away from considering all mitigating evidence, as discussed in *Boyde.* Although he argued evidence in aggravation of the penalty outweighed evidence in mitigation, he did advise the jurors to take into account the mitigating evidence. He even told the jury that Turner's intoxication, if believed, and his age were mitigating factors. RT: 1850, 1851.

Defense counsel's argument also emphasized the subjective nature of the jury's task, saying: "The critical term is outweighed. Does aggravation outweigh mitigation. And I think the law fails to give you much definition at this point. I think a lot is left up to you." RT: 1858.

Turner has failed to demonstrate that the claimed instructional omission was erroneous or, in light of argument of both counsel, prejudicial under the *Brecht* standard. 507 U.S. at 637, 113 S.Ct. at 1721–22. Claim 30 is denied.

---

**29.** Oddly enough, he does not address the analysis of the California Supreme Court in his own

direct appeal. *See* 50 Cal.3d at 710–12, 268 Cal.Rptr. 706, 789 P.2d 887.

## VI. Cumulative Error

Turner contends that the cumulative prejudice of the errors identified in Claims 10, 11, 12, 16, 17, 18, 19, 20, and 27 meets the "actual and substantial disadvantage" standard articulated in *Frady*, 456 U.S. at 170, 102 S.Ct. at 1596. On this basis, he argues his procedural default of the claims should be excused. The State maintains that ample evidence supports the robbery and first degree felony murder convictions, the robbery murder special circumstance, and the death sentence determination. Each conclusion reached by the jury was well substantiated. Accordingly, the State argues, Turner has not met the *Frady* standard because he cannot demonstrate that his trial was infected with "error of constitutional dimension." *See id.*

To the extent the State's argument seeks confirmation of the validity of Turner's robbery conviction and the robbery murder special circumstance, it exceeds the scope of the Memorandum. Those precise issues are not presently before the Court. Nonetheless, Turner's argument fails. In each of the nine claims identified by Turner in this argument, a determination has been made there was no error, no prejudice, or both. The sum of no prejudice plus no prejudice is still no prejudice. The determination respecting each enumerated claim is unchanged by Turner's cumulative error argument.

## VII. Order

For the reasons set out above, Claims 10, 19, and 30 are denied on the merits. Claims 9, 11, 12, 16, 17, 18, 20, 21, 27, 34, and 36 are dismissed as procedurally barred. Turner has failed to overcome this bar by a showing of either cause and prejudice or a fundamental miscarriage of justice.

Pursuant to a briefing schedule previously established, Turner shall file and serve points and authorities in support of the remaining claims alleged in the Petition and the State shall file points and authorities in opposition. Turner may file and serve a traverse 30 days after service of the State's opposition.

Concurrent with the due date for his traverse, if any, Turner shall make arrangements to schedule a telephonic status conference. Turner shall request the conference to be set at the earliest date possible and shall give notice of the conference date and time. At the status conference, the parties shall be prepared to discuss the need for further briefing, hearings, or orders.